May it please the court, my name is Richard Wright. I'm here to represent the plaintiff's parole appellant here. You can see him right back here behind me. This is an appeal for a grant of summary judgment in an employment discrimination case. When I first looked at this case, I became basically familiar with the facts in the case. I was surprised because the personnel system and operation here are treating my client very shabbily. No personnel system and no major organization is ever intended to achieve that result. Employers don't want to do it for good sound business reasons. They don't want a bunch of angry employees. They want to encourage loyalty and they want to present the appearance as well as the reality of fairness. The result in this case was not fair at all. My client was a long service, highly valued, very good employee, was displaced by a younger employee with less service. That's a bad result no matter how you look at it. It took me a long time as I was looking into this case to understand why that happened. At first I thought the person she was competing with was the woman from Fort Richardson and I couldn't understand how Fort Richardson got involved. It took me a while to realize what had happened here. What has happened here is that the attorneys for APHIS, to their credit, have managed to obscure the issue in this case. The issue in this case is why wasn't the RIF participated in by the other employee whose job was affected as well as my client. That's the whole issue. The defendant's position on this case is well summarized in their own brief where they state APHIS consolidated the position for economic reasons. That's admitted. Eliminating plaintiff's position because it was on the lower pay scale and demoted plaintiff because she received the lowest retention score on the RIF. The problem with that is they didn't eliminate just Ms. Potts' position. They eliminated both positions. At the end of the RIF, the cashier cage and the customer service positions no longer existed as separate positions. They were combined. In my brief, I draw an analogy between two cans of paint. You have blue paint, you have green paint. You have something completely different. If you don't have a different job, you never call in the classification specialists. In the briefing, there's a classification regulated saying you re-examine a job where there has been a substantial change. So before the classification people even got involved in this case, there had to be a substantial change. There was a new job. The other fact that concerned me was the fact was the involvement of Ms. Jonez. At first, the position of the United States was clear. In their own briefing below, they argued that her decision was the most important decision made because it was undisputed that she knew nothing about, she didn't even know the names of the people involved. She certainly wouldn't be aware of their age or race or national Anyway, I didn't have anything to do with which position was to be eliminated. All I was doing was giving you my opinion based upon my field as a job classification specialist, how that job would be classified. It had nothing to do with which position is eliminated. Then of course, the United States backs off and they say, oh, well, it's not really important, blah, blah, blah, blah. Well, of course it was important because it was the first reason they advanced for this case and it turned out to be wrong and guess what that's called? It's called pretext. It would be helpful to me if you would point us where in the record you think we would find the issue of fact with respect to discrimination based either on age or national origin and where we would have to be some evidence of that so that the alleged reason would then be pretext. So, where do you think is the best evidence of that? I think the evidence is pretty well summarized in the brief submitted below by the counsel at the trial. His brief, you know, what witness do you think we ought to look to in terms of the affidavits? I think you need to look to, of course, my client's affidavit and she had a friend come in and gave an affidavit and her name escapes my mind. Once again, she's mentioned in trial counsel's briefing who talks about the difference in the way my client was treated by the store manager. My client talks about the way she was treated differently by the store manager and I think those things are kind of helpful in that regard. Certainly enough, if you draw the inference, the permissible inferences in favor of my client, you have to defeat some re-judgment here. You know, one of the other things about a personnel system that failed here and relates to... Well, I mean, can you, as you stand there now, can you point to any, you know, specific evidence that the supervisors dislike related to your client's age or national origin? Well... That's what we're asking. Specific evidence, I can point to specific evidence that raises that inference. There is no evidence in this case that Mrs. Venezuela said, I dislike her because she's older, I dislike her because she's Taiwanese-American. There's no evidence of that. These people know better than to say something stupid like that. Well, we're, you know, I don't... But her actions speak pretty loudly. Well, you don't need direct evidence. That's correct. Circumstantial would be fine, but, you know, sometimes people just don't like each other, so our job is to figure out, you know, what are the reasonable inferences based on the evidence, so are there other affidavits we have to look to that we could infer that it has something to do with age or origin? Once again, I think the evidence that relates to that was well set out in trial counsel's brief. He's not here. I understand that. And you are. I understand that. But his argument is part of the excerpt. What inference should we draw from that? From what? Well, there's the history of trouble between my client and her immediate supervisor. There's the fact that she was not part of the on-work social circle. She didn't... She was not part of the off-work social circle that the same supervisor had with other employees, especially the employee who was favored by the torturing of the personnel system at birth. Now, was that personal favoritism? I don't know. That's not what the United States argued below. I mean, they could have argued that. They could have said, well, they were personal friends and she tried to help her, but that doesn't have anything to do with race or national origin, therefore we went on the issue. I mean, that's an honest winning argument, but that's not what they said below. What they said below is it was done because of a decision Mrs. Joines made at headquarters, and then Mrs. Joines says that's not what I told them at all, and they know that, so the United States suddenly starts backtracking. So we've been caught in one fib already. The other thing I want to point out to the court is, just briefly, is that in the case of RAD versus Fairbanks-Northstar School District, that was an appeal from this same district court to this court of appeals involving an application of McDonnell-Douglas-Burdine-Lidney to a factual case in which the same district court made the primary mistake, which I think was made here, and that is it substituted itself to the jury and it started weighing the value of the various evidence, and I think if this court will read that decision, if it hasn't already, and look at the decision made below, it will realize that error. I've got about a minute left and I'd like to reserve that for rebuttal if I may. Sure. May it please the court, my name is Katherine Dawson, I represent Secretary Rumsfeld. As an initial matter, the district court erred as a matter of law in accepting plaintiff's late appeal. First, the district court applied the wrong legal standard in accepting the appeal for good cause. And second, it's clear the plaintiff didn't satisfy the correct standard, which would be excusable neglect in this case. Only neglect that plaintiff pointed to was her counsel's error in interpreting an unambiguous rule of appellate procedure. And this court has held that that type of misinterpretation by counsel does not constitute excusable neglect as a matter of law. It's not clear how that error was even relevant to plaintiff's decision to instruct her counsel not to appeal her case, but to the extent that there is any relevancy there, that error as a matter of law does not constitute excusable neglect. And so we would ask this court to dismiss the case for lack of jurisdiction. The district court apparently said, I think he said that the counsel's error is not excusable. Correct. Is that right? That's correct. But then he said there are reasons counseling, leniency in this case or something. But is that what you're relying on in part? Right. The court found specifically that there was not excusable neglect. The court determined that counsel's error could not constitute excusable neglect. And then the court stated, but it nevertheless found good cause to accept the later. Now, we could read that as good reason. I mean, it's just an explanation of what he's doing instead of it being technical. Well, that's true. But under this court's case law, including the Committee for Idaho's Desert and other cases, when the excuse for when the reason for the late appeal is a counsel's misreading of a simple rule, the court doesn't even get to the equitable factors that the court considers here. Well, if that were the initial reason, but then ultimately the reason it got filed late had to do with the erased message, then it seemed it would be within the ambit of the district court as to get here to say, well, I'm going to let this go forward. That's a circumstance. I'm not going to try to have a hearing on it. Let's just let her have her appeal. Why wouldn't that be sufficient? So he's not really saying it's the counsel's error, although that may have been the beginning of this cascade of events. Well, the counsel's error was the only legitimate excuse offered for the late appeal. The rest of the explanation just doesn't make sense. From the beginning, the plaintiff said that she relied on counsel's error in deciding that she didn't want to appeal. She affirmatively instructed her attorney not to file an appeal, and then at some time later, it's unclear whether her counselor ever corrected his error. She decided that she changed her mind and that she did want to file an appeal. It's not clear how the message, the messages and these other things really relate to her ultimate justification for the late appeal. But in any event, the district court was correct in rejecting plaintiff's pretext claim. Plaintiff doesn't dispute that the relevant decisions here were made generically, and the evidence shows that the decisions were made generically without regard for the individuals who were holding the positions at issue. The only person that plaintiff alleges harbored any discriminatory animus towards her is Ms. Valenzuela, her immediate supervisor, and yet there is no evidence connecting Ms. Valenzuela to the decision-making process, and there's no evidence suggesting that any animus that Ms. Valenzuela may have harbored towards plaintiff was motivated by plaintiff's national origin or her age. There's simply no evidence connecting those two, and both of those flaws are fatal to plaintiff's claim here. To survive summary judgment, plaintiff cannot rest on allegations alone. The district court here was correct in determining that no reasonable jury could look at this evidence and conclude that there was a plausible inference of discrimination. Therefore, unless the court has any further questions, we would ask that the court affirm. Thank you. You want to say something? Yes, if I may. Insofar as the issue of whether or not the appeal is timely or not, I'd just as soon rest on the briefing. I think that argument is well made there. My brief is nothing more than a reiteration of what I said in motion practice, but I do want to address pretext and the store manager just briefly. Now, there's no question that Mrs. Valenzuela was the store manager, and there's also no question, if you read the court's opinion below, that it turns out she was a consultant. The court at one point says, well, first they're saying this decision was made at Dallas, and then later on the parties agreed that the decision was local. Okay? Now, in a rational world, if you're the boss of the store manager, you're not going to make a decision that affects how her store is run, how much profit you make, how your sales are. I mean, that's what this is about. This is a retail store without consulting with that person and getting that person's input. And eventually it turned out that the matter was discussed with her. Now, the amazing thing about this is you can look at this, step back from it, don't suspend your credibility, step back and then look at it and say, how did this system operate to foul up this woman to her prejudice? And the answer to that is the system didn't work right. Now, the key question you have to ask here is why didn't this store manager come forward and say, whoa, both of these jobs are being affected. Our own regs require that all affected jobs be part of the RIF. Why are you doing this to one of my most valuable employees? The only reason I can think of is the same reason she wasn't part of the social group and the same reason she wasn't part of the on-work social group and the off-work social group and the same reason she was treated poorly by the same store manager, and that is because she didn't like her either because of her age or ethnic descent. Thank you very much. Thank you. May it please the court, my name is Isaac Zeray and I represent Christopher Graze, the appellant in this case. As has been outlined in our briefs to this court, district courts grant a summary judgment ought to be reversed because in this case genuine issues of material fact remain in dispute and the district court did not correct it by the relevant substantive law. As a moving party for summary judgment, Mr. Peters bore the initial burden to demonstrate that no genuine issue of material fact remained in dispute and that judgment as a matter of law was appropriate. In its Anderson v. Liberty Lobby decision, the Supreme Court held that the substantive law will identify which facts are material to the case at hand. In his motion for summary judgment, Mr. Peters failed to correctly identify the relevant elements of Mr. Graze's discrimination claim and as such he failed to satisfy his initial burden of production and summary judgment ought to have been denied. Mr. Peters' summary judgment motion contains two substantive law flaws. Each flaw independently precluded summary judgment in this case. First, Mr. Peters argued incorrectly that Mr. Graze can only establish a prima facie case of disparate treatment under Title VII by applying the four-part McDonnell-Douglas test. By so arguing, Mr. Peters disregarded this Court's 1985 ruling in Lowe v. City of Monrovia which held that a plaintiff may establish a prima facie case of disparate treatment by satisfying the McDonnell-Douglas four-part test, thereby creating the rebuttable presumption of discriminatory treatment or by presenting actual evidence direct or circumstantial of the employer's discriminatory motive. Which is true because people get too hung up on McDonnell-Douglas, I would agree. Somehow it seemed to have overtaken everything else in the Court of Law. We forget that you can prove things by direct evidence. Exactly. So what is the direct evidence here? Well, the direct evidence of discriminatory motive was outlined very clearly in the brief. First of all, there were allegations made from the very beginning that Mr. Graze was not performing satisfactory at his job. And then Mr. Graze presented evidence proving that he was performing his job. There was also direct evidence of discriminatory motive. Mr. Graze observed another teacher at the facility mistreating children. Mr. Graze spoke to Ms. Henry, the supervisor, and said, I observed this occurring. This is a female teacher abusing this child. And Ms. Henry's response was, Who are you, a man, to judge how a grandmother treats a child? This came just weeks before Mr. Graze was accused of child abuse. It was unsubstantiated. But when he was accused, instantly he was pulled out of the daycare facility, unable to work with children anymore, and yet nothing happened. Mr. Graze actually pointed out two instances where Ms. Abrams acted inappropriately toward children. And Ms. Henry's response both times was, First, she said, Who are you, a man, to make this decision? And the other one was, Do you enjoy working here at this facility? Rather than, All right, let's go over your concerns. Let's try and see what the validity was. Mr. Graze addressed that to the court. Additionally, this whole case is based on the allegation that there was a third, substantiated allegation of physical abuse of a child, where actually the facts clearly show that this third allegation dealt with two issues. The first issue was an allegation that he had physically abused a child. And by the way, all of these allegations against Mr. Graze were prompted or had some relation to Ms. Henry, who was alleged to have been discriminating against Mr. Graze. But this third allegation dealt with whether or not a child was abused, and then also dealt with whether or not medication had been misadministered. The police, the security police who investigated, found that there was no substantial evidence of any physical abuse. It did conclude that there might have been some misadministration of medication to the same child. However, when Ms. Henry, or when the summary judgment motion was filed, throughout it says that Mr. Graze was terminated because of substantiated allegations of physical abuse. That is simply not true. That was not the reason. However, when... I didn't get that at all from the briefs. I thought the third instance was upheld when I investigated. Well, that's the issue. The investigation... Well, no, it was upheld by the Family Case Maltreatment, this organization in which Ms. Henry was a member. And although the brief states she played no hand in it, Mr. Graze's response brief pointed out where testimony proved that she did play a hand in all of these allegations. But the third allegation was not substantiated by the security police. It was substantiated by Carol Hughes' family advocacy. However, Carol Hughes stated that she did not speak to Chris Graze at all. All she spoke to was a five-year-old child. That was all she based it on. So she didn't talk to the security police. And she recommended that this third incident be substantiated. And her reasoning... And this was in the briefs submitted to the district court. Her reasoning stated that, well, it's the third incident. And, you know, the child said that Mr. Graze did this, so I... Carol Hughes said, I recommend this be substantiated. Then the board went ahead and substantiated it. There was no mention. And also when Mr. Graze was terminated, mentioned that he was terminated for abusing a six-year-old child, a five-year-old child. But that was not, you know, the only person who substantiated it was Carol Hughes. The police who investigated, who spoke to Mr. Graze, spoke to all the witnesses involved, said, no, there's nothing in that deposition of that. Security police is in the record. And that security police said, no, we did not substantiate a physical abuse. All we did was observe that medication was misadministered. And that was classified as neglect. And so when they said... Did they not find, did they dispute the bloody lip issue? Well, Mr. Graze and everybody had mentioned that blocks were being thrown. And the security police said, that's, you know, seems a very likely incident. When they spoke to the five-year-old child, first the child said, yeah, Mr. Graze threw me up in the air. And I flipped around and fell on the ground. And then when she asked again, he said, well, Mr. Graze came up to me and I fell on the ground real quickly. And that's how I hurt my lip. So his story was inconsistent. Mr. Graze said that they were throwing blocks. And that seemed a much more, you know, likely and reliable reason for it. But that's the direct evidence. But the argument presented at the district court stated all it rested on was the fact, was the allegation that Mr. Graze could not establish the McDonnell-Douglas four-part test. And what it did, it added to this four-part test. It added to the McDonnell-Douglas test. The second element of the McDonnell-Douglas test states that the plant has to prove that he was qualified for the job or satisfactorily performed his job. That's what the defendants, I mean, that's what Mr. Peter's motion stated. And then he cited to McDonnell-Douglas. Well, nowhere in McDonnell-Douglas does it say that the plant has to have satisfactorily performed his job. All it says is it has to be qualified for his job. The district court took that second element and it incorporated that second element into its decision. However, the district court cited Chung v. University of California, Davis. Well, when you look at Chung v. University of Davis, California, it doesn't say that you have to satisfactorily perform his job. It cited to this and it inserted, Mr. Peter's inserted the satisfactorily performed element. The court bought it. And both the summary judgment motion and the order from the district court rest almost completely on this allegation that Mr. Brazee was not satisfactorily performing his job. And what's most interesting is that in this made-up element that they create, it says that there are two elements. You can either prove that he was qualified for the position or that he satisfactorily performed his job. But nowhere in Mr. Peter's motion for summary judgment does it allege any facts saying that Mr. Brazee was not qualified for his position. And the district court, likewise, doesn't say he wasn't qualified for his position. All they say was in the district court's ruling, there are a few. It says, first and foremost, Brazee cannot establish a prima facie case because he was not satisfactorily performing his job. If we got over that and we were to use the McDonnell-Ledlis test, which usually is a benefit, usually a benefit to the plaintiff, and say, okay, he is qualified and he's established a prima facie test, and then it would shift to the government to be able to show an unpretextual, non-pretextual reason for his termination, which they say is based on two things. One, with respect to his performance, the very late, you know, all that litany. So that's one aspect. And the second aspect is they say there was documented physical or sex abuse in their view. Then it shifts back, you know, to Mr. Brazee. So we would need to know from you, why is that a pretext? Why are those two reasons a pretext? Well, what we argued first is that Mr. Peter's brief did not mention, it argued solely the fact that Mr. Brazee had not established his prima facie case. It didn't say this is the pretext. Yes, Mr. Peter's. I mean, this was the non- Mr. Peter's was the trial counsel for the government. No, the government, Mr. Peter's, by Secretary of Air Force. Okay. But the government- They changed so often, you don't quite, you know. But the government argument rested solely on the allegation that Mr. Brazee could not establish a prima facie case and therefore never presented any legitimate non-discriminatory reason. The court inferred and said, well, I don't think that Mr. Brazee performed correctly either. This is another interim court's decision. It decided the facts all on its own. It said, look, in these two things, Mr. Brazee didn't satisfactorily perform his job. And it interpreted the government's flawed argument as actually presenting a legitimate non-discriminatory reason, but it actually never did that. And at the prima facie case, you're not supposed to, you know, the government's not permitted to make any type of determination that relates to the veracity of Mr. Brazee's case. So the key flaw here is that the government did not provide, its whole argument rested on a created additional element to McDonnell-Douglas test. And Mr. Brazee responded with a range of evidence pointed out in both the response and in his motion to reconsider specific direct evidence showing discriminatory motive by Mr. or by Ms. Henry. Well, your time is well over. OK, I didn't turn red so I didn't know. I didn't know if I had. It seemed like I was talking for a long time. It's a ten minute argument. Yes, we make it for time. Sorry. OK. I was rambling. I thought I had five minutes to do more. Good morning. My name is Rhetta Randall. I'm assistant U.S. attorney with the District of Alaska. And the current secretary of the Air Force who I am technically representing is now Dr. James R.M.C.H.E. There are several things I would like to respond to in his argument, but primarily I would like to address the case law in addition to Lowe v. City of Moravia. It is a little bit perhaps the way the spacing of the brief was written, but the basis for the elements to show what Mr. Brazee must prove in terms of a prima facie case, it set forth, and that's what my first case study is on page 14 of my brief, that's Godwin v. Hunt-Wesson. As the court has stated, the McDonough Douglas factors have sort of permeated over the years, and one of the situations that comes up is what do you do with an employee who is already in a position as opposed to when someone is applying for a position and being discriminated against. And the Godwin case discussed whether or not the second factor was, was she performing according to her employee's legitimate expectations, and that's in the Godwin case at 150 F. 3rd, 1217, specifically at page 1219. Mr. Gosset, when he filed his complaint and after the depositions were taken, basically the evidence showed that there was no direct evidence of discrimination in this case, and that is why I, on behalf of the government, filed the motion for summary judgment. And I think Judge Sedwick, one of his concerns and the reason he filed for summary judgment is because there was nothing presented by Mr. Gosset in compliance with rules for summary judgment, no affidavits, there was nothing but Mr. Gosset's own self-serving allegations, his statements in the depositions, nothing showed direct or indirect discrimination in this case on the factor of race, and that was his basic allegation that it narrowed down to. He was a male and he was being discriminated against in what was considered a female position. His primary target of who he says discriminated against him was Maxine Henry. She oversaw the trainee program. Basically, Mr. Gosset was accepted into a program to learn how to train people who were going to become caretakers. He was a probationary employee during this time. Immediately when he arrived at the facility, there were problems with his attitude and his questioning of the system. He had worked at Travis Air Force Base as a child caretaker. He was questioning what was happening in the job, what he had to respond to. He was looking for leave that wasn't appropriate. And Ms. Henry had an initial counseling session with him. She put it in writing, it is in the excerpts, where she discussed his difficult attitude and some of the tardiness that he was incurring, but she recommended that he be continued in the program. Where did he say about any of these things? He didn't dispute that they occurred. He has never, through any of the documents that he has provided, disputed that he was tardy, that he had a lot of questions, that he had a difficult attitude. In fact, some of his own excerpts go against him in his allegations. He talks about the negative attitude and one of the excerpts, if I can find it, I'm sorry, it is my excerpts of record, the supplemental excerpts from 82 to 84, when you compare the progress reports of the three trainees, you notice that Mr. Grasse is very behind on the things that he was supposed to accomplish throughout the training session. The other two female interns were finishing things that they were required to do fairly quickly. He never responded to that. He never said it wasn't correct. He never gave a reason for it. He has to prove that anything that happened against him, in an adverse employment relationship, was based on race. Most of the things that occurred were valid employment management concerns that were being aired with Mr. Grasse. And he doesn't contest any of those happening. It's just that they build up, then he says, oh, this is because he was a man. The Abrams issue is interesting because that is rebutted by his own excerpts. He says that Ms. Abrams was a teacher who was very vocally loud with the students. And he claims that Ms. Henry made a statement to him, what are you, a man, questioning her as a grandmother? Other than him making that statement, there's no other evidence that that conversation took place. That's true. Here's his evidence. True. But it has to be a substantiated allegation. I mean, if you can survive a summary judgment motion by just putting in substantiated allegations of racial discrimination, there's no reason. Well, if you were a percipient witness to something, and it creates an issue of fact, the fact that you're the only one who said it is why we invent trials. That's true. And then Ms. Perry Miller provided a statement, and that's in the plaintiffs' excerpts of 193 to 200, where she discusses the Abrams issue. The reason Mr. Brasse, and accurately so, would not know of any counseling or results of his complaint about Ms. Abrams, that would be a separate personnel matter. Ms. Henry would be violating some personnel privacy acts if she told Mr. Brasse, well, this is what I'm doing to Ms. Abrams about this matter. That would not have been appropriate. Another employee, Carrie Miller, states that what they understood or heard is that Ms. Abrams did get counseled, and there were some follow-up personnel things that occurred. That's in his own excerpts. Even though he said this is a reason for sexual discrimination, she was taken care of, she was handled properly in a personnel proceeding, just as Mr. Brasse was. The thing you have to look at is, ultimately, he was terminated because of the Air Force regulations, which do not allow someone who has been found substantiated child abuse, and it wasn't any sexual abuse. What it was was impermissible restraint of a child. They had certain guidelines, and those documents are also in the excerpts. It's something on my search record at 80, I believe. This is the third child abuse allegation, and every single person who made an allegation of child abuse had nothing to do with Maxine Henry. After the allegations are made, it goes to the family maltreatment case management team for evaluation. Also, in the excerpts of the record, it shows that Ms. Henry was not involved in any of those determinations. The first two allegations were not substantiated. The child was either discussed or talked to a little later. The third incident, the child was talked to immediately. If you look at the facts, no one involved in those child abuse allegations included Ms. Henry. She wasn't involved in that at all. Well, she remembered as CM, or whatever the initials were. She did, but as being his supervisor, she withdrew consideration, and there was, as part of the administrative record, they went back and questioned everyone as to whether they remembered Ms. Henry's participation, and that was in the supplemental excerpts of records 85 through... I'm sorry. It's after 80, supplemental excerpts of records 80. It shows where, during the administrative process, they went back and questioned everyone on the family management team, and everyone remembered that she had withdrawn from having any input because of her relationship with him. He talked, Mr. Grasse talked initially about Ms. Henry, counseling about his negative attitude. That was the first thing that he said, it was because he was a man, he had a negative attitude. But also, in the supplemental excerpts of records, page 85, Ms. Henry has previously terminated a female intern. It goes through 89. It was a woman named Candy Young. She was terminated for having, during the probationary period, for having a negative attitude about the program and about not being able to follow the rules of the program. She was terminated for that reason. Mr. Grasse was not terminated because of his negative attitude. He was terminated by other individuals after finding of substantiated child abuse, and that is a reason that has never changed. The reason there are the two issues is because Mr. Grasse has raised both of the issues, and Judge Sedgwick addressed how he was performing on the job versus his ultimate termination. He can't make a prima facie case because none of the ways he was dealt with on the job was based on sex, as he claims. No one else substantiates that. His allegation is there, and if that's all the court feels is necessary for a trial, so be it. But Judge Sedgwick's concern... The allegation certainly wouldn't be enough in the pleadings. It's just whether or not there's admissible evidence. And that was Judge Sedgwick's concern, is that there was nothing that was provided to him during the summary judgment proceedings that was admissible in court, that was substantiated in any way. Some of the statements that Mr. Grasse says in his deposition and any supporting documentation in front of that is all unsubstantiated hearsay. I heard someone tell someone that she doesn't like me because I'm a man. No one has corroborated that. There is one statement by Melissa Pulasik, it's the Plaintiff's Excerpt 217, where it wasn't Miss Henry who was complaining about Mr. Grasse being a man. She was saying he was difficult, that he asked a lot of questions, but a woman named Diane is the one who referenced him being a man and not seeming to be happy. And even that wasn't really direct testimony. It was more of, I heard that he does this. And that's what Judge Sedgwick made the finding. It didn't meet the standards of summary judgment, and that's why he found the way he did, and the government would ask that his finding be affirmed. Thank you. I'll give you a minute for rebuttal. What's that? I'll give you one minute for rebuttal. Honorable Judges, listening to the response proves the reason why this case should be reversed. Throughout her statements, she presented facts that were clearly in dispute, that were disputed in the record. She stated that Henry did not participate in any of these things. Well, we have witnesses that were in the record stating that she did participate. They said she didn't actively participate, but she did participate, and she did create a consensus on the board regarding this third allegation. And she also initiated the second allegation, and she was there through all three of the allegations. Statements that Mr. Grise never contradicted any of these allegations of poor performance. That's what his first EEO complaint was about, was that, hey, they are abusing me because I am a man. So that has been rejected from the very beginning. Well, is it disputed that he had a problem of showing up on time? Well, yeah, it was disputed that that was a main issue. I didn't ask you that question. Was he punctual? He was as punctual as the females that were in the program. So that was the issue. They came in late, he got punished. And he produced evidence showing they came in late on a regular basis as well. And so the reason why he was punished was because, and this is circumstantial evidence, that he was punished because he was a man. And so throughout this whole thing, there was no, they have not proven at all that there are. How about taking unapproved leave without notice? Well, again, that is disputed by Mr. Graze as well. He had received permission to take that leave. Later on, Ms. Henry comes in and says, well, no, you didn't have it through the right channels. And so this was also in the original EEO complaint. But all these refer to satisfactory performance in his job. And yet that's a made up thing. Legitimate expectations, whatever the legitimate expectations are, do not mesh absolutely with satisfactory performance of the job. Who determines whether he was satisfactorily performing? Ms. Henry, who's alleged to have this discriminatory motive against him. In addition, there was, he submitted direct evidence of discriminatory motive, and that trumps the McDonnell-Douglas test, even if it was shown. The key thing, they never proved that he was not qualified for the job. So all this stuff about him being tardy, all that, that's irrelevant. It doesn't affect whether or not he was qualified for the job. And that was the second element of the McDonnell-Douglas case, which they never said he didn't prove, and which still, you know, he did satisfy that element. Thank you. Adderall, stand submitted.
judges: Pregerson, Canby, McKeown